UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

MARCUS DEEGAN,

     *Plaintiff*,


v.                                                              Civil No. 1:21-cv-00257-SM

THE TJX COMPANIES INC.,
d/b/a T.J. MAXX,

     *Defendant*.

_____


# EXPERT REPORT OF

# MICHAELYN CORBETT, PH.D.


Charles River Associates

# Table of Contents

I.     Qualifications ...................................................................................................................... 1

II.    Allegations, Assignment, and Preparation ........................................................................ 1

III.   Summary of Opinions ........................................................................................................ 2

IV.    Analysis of Potential Economic Losses ............................................................................. 3

   A.   Role of the Damages Expert ......................................................................................... 3

   B.   Background on Mr. Deegan's Professional Experience and Job Search Efforts ............................. 4

   C.   Summary of Plaintiff's Approach to Economic Losses .................................................... 5

     1.   Plaintiff's damages approach assumes Mr. Deegan will not be able to secure comparable work ....................................................................................................................... 6

     2.   Plaintiff's damages approach implies Mr. Deegan would have been paid far above the market rate until retirement ............................................................................................. 7

     3.   Plaintiff's damages approach incorrectly assesses the value of lost benefits ............................ 8

   D.   Mr. Deegan's Efforts to Seek a Comparable Job .......................................................... 9

     1.   Mr. Deegan's Job Search Efforts ............................................................................... 9

     2.   Relevant Positions Are Available ............................................................................. 10

     3.   Job Search Criteria Developed by the State of Florida ................................................. 10

## I.  Qualifications

1.  I, Michaelyn Corbett, am a Principal at Charles River Associates ("CRA").  CRA is a leading consulting firm that offers specialized economic and financial consulting services in a variety of areas.  I was previously an Adjunct Instructor at Loyola University, Chicago, Department of Economics, where I taught Industrial Organization.  Over the past 20 years, I have provided economic consulting and expert testimony in a wide variety of cases and have routinely performed economic analysis in labor and employment-related matters.

2.  I hold a Bachelor of Arts degree in Finance from Saint Louis University and a Ph.D. in Economics from the University of Illinois, Chicago.  At the University of Illinois, I completed the graduate sequences in labor economics and health economics and passed the comprehensive examination in both subject areas.  I am a member of the American Bar Association, Sections of Labor & Employment Law, Antitrust Law, and Litigation Law.  A copy of my curriculum vitae is attached as Exhibit 1.

3.  CRA bills $540 per hour for my time.

## II.  Allegations, Assignment, and Preparation

4.  According to the Complaint filed in this matter, Plaintiff Marcus Deegan ("Mr. Deegan") alleges that he suffered discrimination in his termination from Defendant T.J. Maxx ("T.J. Maxx") based on his purported disability.[1]  The law firm of Seyfarth Shaw, LLP, acting on behalf of T.J. Maxx, has requested that I review and critique the damages calculations put forward by Plaintiff's counsel.[2]  In addition, I have been asked to evaluate data on job availability in Florida taking into account relevant labor market statistics and objective benchmarks related to adequate job search, in order to assist the finders of fact in determining whether Mr. Deegan sufficiently mitigated his alleged lost earnings.

5.  I am not offering, nor have I been asked to offer, any legal opinions.  My opinions are based on my training and experience as an economist, and economic analyses of relevant facts in this case.  In the course of conducting my analyses, I have reviewed relevant evidence available in discovery and publicly available information, including job postings, labor market statistics, and information from the Florida Department of Economic Opportunity ("DEO").  The documents I have reviewed in preparing this Report are listed below.  Should additional information be produced subsequent to my Report, I reserve the right to consider such information in finalizing my opinions and may modify or expand my analyses if appropriate.

---

[1] Complaint, *Marcus Deegan v. The TJX Companies Inc. d/b/a T.J. Maxx*, February 12, 2021, ¶¶ 34, 45, 57, 68, 83 (hereafter, *Complaint*).

[2] See, Deposition of Marcus Deegan, October 8, 2021 (hereafter, *Deegan Deposition*), p. 231 and Exhibit 23.

<u>List of Documents Reviewed</u>

- Complaint, *Marcus Deegan v. The TJX Companies Inc. d/b/a T.J. Maxx*, February 12, 2021.
- Deposition of Marcus Deegan and Exhibits, October 8, 2021.
- Plaintiff's Answers to Defendant's First Interrogatories, September 27, 2021.
- Plaintiff's Responses to Defendant's First Requests for Production of Documents, September 28, 2021.
- Resume of Marcus Deegan (undated).
- Pay Statement for Marcus O. Deegan, Holiday Inn Express, 9/3/2021.
- Earnings Statement for Marcus O. Deegan, TJX Companies, 2019-2020 (T.J. MAXX000184-241).
- The TJX Companies, Inc. Retirement Plan, Summary Plan Description, 11/2019.
- Supplemental job search documents of Marcus Deegan.

## III.   Summary of Opinions

6. Based on my review of Plaintiff's damages calculations, I find that they significantly overstate Mr. Deegan's potential economic losses, assuming T.J. Maxx is found liable for the alleged acts.

7. The underlying assumptions in Plaintiff's damages calculations are that Mr. Deegan engaged, and will continue to engage, in reasonable job search that mitigates his damages and will not obtain alternative employment comparable to his T.J. Maxx position through the remainder of his expected work life.  Without offering an opinion on the merits of the underlying claims, a decision by Mr. Deegan not to engage in adequate job search should reduce any monetary damages award. Further, the model's assumption that Mr. Deegan will never find comparable work at any time in the future is speculative and contradicts standard economic theory.

- My analysis indicates that Mr. Deegan's employment search efforts do not meet objective benchmarks issued by the state of Florida that constitute adequate job search.  For example, the Florida DEO requires job seekers to make a minimum of five job contacts per week (e.g., sending resumes).[3]  However, it is not clear that Mr. Deegan ever achieved five job contacts in *any* week since his separation from T.J. Maxx.  Rather, Mr. Deegan appears to have engaged in about one-tenth the level of job search on average required by the DEO.

- My analysis of relevant job openings and labor market conditions since Mr. Deegan separated from T.J. Maxx indicates that numerous jobs, comparable to Mr. Deegan's former position, have been available in his geographic area.  I have seen no evidence that Mr. Deegan has applied to any of these positions.

---

[3] While the search requirement was temporarily suspended during the early stages of the pandemic, this does not negate the relevance of the agency's view on what constitutes reasonable job search.  See, http://floridajobs.org/Reemployment-Assistance-Service-Center/reemployment-assistance/claimants/claimant-faqs-(new).  ("In order to better serve you, Governor DeSantis waived this requirement. Effective March 15, 2020 until April 24, 2021.")

8.  A second implication of Plaintiff's damages model is the assumption that Mr. Deegan's future earnings will never catch up with his previous level and that he will continue earning about 27% of his former T.J. Maxx earnings for over a decade until his expected retirement. This is inconsistent with the idea that there is a market value for Mr. Deegan's skills and services and that in competitive markets, workers are paid the value of their marginal product.  It is also inconsistent with the idea that T.J. Maxx is a profit-maximizing business.

9.  In addition, Plaintiff's damages model contains critical errors related to the "loss" of fringe benefits, including the unfounded assumption that Mr. Deegan would never secure work that offered comparable benefits, or any benefits at all.

10. All of these unsupported assumptions and methodological flaws render Plaintiff's damages model unreliable.

## IV.   Analysis of Potential Economic Losses

### A.  Role of the Damages Expert

11. In a standard damages analysis, a damages expert typically assumes that the defendant is liable for the defendant's alleged wrongful act when quantifying damages.[4]  The commonly accepted approach for assessing damages in a lost earnings case includes examination of both "but-for" earnings and actual or expected future earnings. The plaintiff's "but-for" earnings are the earnings the individual would have earned in the absence of the alleged act. The actual earnings are the plaintiff's earnings (or in some cases, projected future earnings) given the consequences of the alleged act.[5]  The lost earnings (or damages) equal the present value of the difference between the actual and "but-for" earnings,[6] taking into account reasonable efforts by the plaintiff to mitigate damages as appropriate.[7]

12. I understand that in most lost earnings cases, plaintiffs claiming damages have a duty to mitigate, requiring them to take reasonable steps to minimize the damages they incur by finding alternative employment.[8]  One role of a damages expert is to adjust actual earnings to take into account reasonable efforts to mitigate damages.[9]  If a terminated employee does not make reasonable efforts to obtain comparable employment, "actual" earnings or an absence of actual earnings will not appropriately measure mitigated earnings.

---

[4] Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3rd ed. (Washington, D.C.: National Academies Press, 2011), p. 429.

[5] Daniel G. Lentz and Elizabeth B. Sandza, "Lost Earnings of Persons," in LITIGATION SERVICES HANDBOOK, 6th ed., eds. Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans (Hoboken, NJ: John Wiley & Sons, Inc., 2017) (hereafter, *Lentz and Sandza*), Chapter 13, § 13.3.

[6] *Lentz and Sandza*, Chapter 13, § 13.3.

[7] *Lentz and Sandza*, Chapter 13, § 13.4(a).

[8] *Lentz and Sandza*, Chapter 13, § 13.4.

[9] *Lentz and Sandza,* Chapter 13, § 13.4.

13. In addition, a damages expert typically analyzes whether there is evidence consistent with the alleged actions "causing" the claimed damages. If the alleged acts contributed to the damages, then the expert must separate the impact of the alleged wrongful acts from other important influences that may explain what happened in the actual (or future expected) world and appropriately apportion as damages only that attributable to the wrongful acts.[10] In other words, a proper economic analysis of damages requires that the expert control for other factors that likely contributed to the harm suffered by the plaintiff. In the present matter, if Mr. Deegan's alleged harm is primarily due to other factors and not due to the alleged actions, then there will be relatively little damages due to the alleged acts.

14. In the remainder of this Report, I describe the relevant background of Mr. Deegan, including his efforts to mitigate damages. I also discuss and critique the economic flaws in his damages model.  I perform analyses showing that many suitable jobs have been available in Florida, and I discuss relevant benchmarks regarding what may constitute reasonable job search.

### B.  Background on Mr. Deegan's Professional Experience and Job Search Efforts

15. I understand that Mr. Deegan started working for T.J. Maxx in 2005 as an assistant store manager,[11] was promoted to a store manager position in 2008, and worked in that capacity until his separation from the company at the end of January 2020[12] at the age of 49.[13]  T.J. Maxx is a subsidiary of the publicly-traded TJX Companies Inc., a global "off-price" apparel and home fashion retailer with operations in the U.S. and abroad.[14]  Prior to working at T.J. Maxx, Mr. Deegan worked as an assistant manager at Kmart for over 5 years.[15] I understand Mr. Deegan has completed some college coursework but does not have a college degree.[16]

16. Mr. Deegan testified that shortly after leaving T.J. Maxx in January 2020, he submitted two job applications to positions in North Conway, New Hampshire—the town in which he was living at the time.[17]  However, by about February 2020, I understand Mr. Deegan and his wife, contemplating a move to Florida, had begun house-hunting and job-searching in several cities in Florida.[18]  Mr. Deegan relocated to Lake Wales, Florida in April 2020.[19]

---

[10] Elizabeth A. Evans, Phil J. Innes, and Daniel G. Lentz, "Damages Theories and Causation Issues," in LITIGATION SERVICES HANDBOOK, 6th ed., eds. Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans (Hoboken, NJ: John Wiley and Sons, Inc., 2017), Chapter 4, § 4.2.

[11] *Deegan Deposition*, p. 37.

[12] Mr. Deegan testified that he was terminated at the end of January 2020. *Deegan Deposition*, pp. 25, 39-40.

[13] I understand Mr. Deegan worked in various T.J. Maxx store locations in Maine and New Hampshire. *Deegan Deposition*, pp. 39-40, 83-84. I have been informed that Mr. Deegan was born in 1970.

[14] The TJX Companies, Inc. 2020 Annual Report, p. 4.

[15] *Deegan Deposition*, Exhibit 24.

[16] *Deegan Deposition*, pp. 22-23.

[17] *Deegan Deposition,* pp. 37-41, 46.  Mr. Deegan testified that he received unemployment benefits in New Hampshire following his separation from T.J. Maxx. However, I am unaware of the work records he may have kept and submitted to New Hampshire's Unemployment Office to support his job search efforts.  *Deegan Deposition*, pp. 236-237.

[18] *Deegan Deposition*, pp. 41-45.

[19] *Deegan Deposition,* pp. 43-48, 228.

17. Following his move to Florida, I understand Mr. Deegan's job search activities frequently included dropping off resumes at various potential employers with no information about whether a suitable job opening was even available.[20]  Mr. Deegan testified that he took a job working as a full-time front desk staff at Holiday Inn Express in Lake Wales, Florida beginning July 2021 earning $13/hour.[21]  I understand that as of my Report filing, Mr. Deegan is still employed at Holiday Inn Express earning the same hourly pay rate.[22]

### C.  Summary of Plaintiff's Approach to Economic Losses

18. Plaintiff's counsel calculates Mr. Deegan's past economic losses for the period January 31, 2020 (his approximate termination from T.J. Maxx) through September 30, 2022 (which I understand to be the scheduled start of trial).[23]  Future economic losses are calculated from October 1, 2022 through Mr. Deegan's estimated retirement at age 65 in October 2035.[24]

19. Absent the alleged wrongful termination, the Plaintiff's damages model assumes Mr. Deegan's "but for" earnings would be equivalent to his previous salary at T.J. Maxx ($85,000/year without bonus).[25]  The damages model also accounts for the earnings Mr. Deegan actually earned at Holiday Inn Express and further *assumes* Mr. Deegan's post-termination future earnings capacity is represented by his current earnings at Holiday Inn Express ($26,000/year).[26]  In addition, the model assumes Mr. Deegan would have earned certain fringe benefits[27] in the "but-for" world, but not in the actual (past or future) world.[28]

20. The model calculates back pay losses after mitigation to be $223,383.41[29] and front pay losses after mitigation to be $898,869.14.[30]  Total back pay and front pay losses equal $1,122,252.55.[31]

21. Plaintiff's damages model fails to provide reliable estimates of the alleged loss in earnings for the following reasons: (1) it ignores Mr. Deegan's job search efforts and assumes without basis that he would not obtain comparable alternative employment, either in the past since his termination from T.J. Maxx, or in the future, through his expected retirement; (2) it assumes Mr. Deegan's future earnings will never catch up to previous levels. The implication is that Mr. Deegan would have been paid far above the market rate had he remained at T.J. Maxx; and (3) it incorrectly computes the

---

[20] See, for example, *Deegan Deposition,* pp. 41-42, 46, 50.

[21] Plaintiff's Answers to Defendant's First Interrogatories, #3; *Deegan Deposition*, pp. 77-81.

[22] Plaintiff's Answers to Defendant's First Interrogatories, #3; *Deegan Deposition*, pp. 77-81.

[23] *Deegan Deposition*, Exhibit 23 and pp. 231-232.

[24] *Deegan Deposition*, Exhibit 23.

[25] *Deegan Deposition*, Exhibit 23 and pp. 231-232.

[26] *Deegan Deposition*, Exhibit 23 ($26,000=$13*40*50).

[27] As I describe below, Plaintiff's damages model calculates the value of "but for" fringe benefits erroneously.

[28] *Deegan Deposition*, Exhibit 23.

[29] The model includes an amount for pre-judgment interest of $8,154.61 on the back pay amount but this is separate from the total back pay loss calculation.  *Deegan Deposition*, Exhibit 23.

[30] *Deegan Deposition*, Exhibit 23.

[31] Plaintiff's counsel also computes compensatory and/or punitive damages of $300,000 and attorneys' fees and litigation costs through September 28, 2021 of $33,486.50 and $707.24, respectively.  See, *Deegan Deposition*, Exhibit 23.

"but for" benefits accruing to Mr. Deegan, and assumes he will never obtain a job offering benefits. Each of these flaws results in inflated damages estimates.

### 1. Plaintiff's damages approach assumes Mr. Deegan will not be able to secure comparable work

22. Plaintiff's back pay and front pay damages model assumes that Mr. Deegan could not have and will not find any comparable work over a 15-year period other than the Holiday Inn Express desk job (which is not comparable) that he obtained in July 2021. This position pays him at a small fraction of the pay rate that he earned at T.J. Maxx.

23. Data from the Bureau of Labor Statistics ("BLS") indicate that the median duration of unemployment for peers engaged in job search (within Mr. Deegan's demographic or industry group) was less than three months in 2020.[32] While the pandemic may have reduced the availability of comparable jobs in the months following March 2020, the evidence indicates that job openings and hiring rebounded to near pre-pandemic levels by the summer of that year, or shortly thereafter.[33] More recently, as of December 2021, there were nearly *five million* more job openings than people seeking work, consistent with a strong seller's market for labor services generally.[34] The unemployment rate in Florida decreased precipitously from a high of 14.2% at the height of the pandemic to about 4.5% in November 2021, consistent with a strong demand for labor following recovery from the period.[35] In Polk county, Florida, where Mr. Deegan lives, the unemployment rate was 3.8% in January 2020 (pre-pandemic), rose to 18.9% in May 2020 and then continued to improve over time, standing at about 4.9% in November 2021.[36] Similarly, the national unemployment rate for workers in the private sector wholesale/retail trades increased from 4.7% in January 2020 to about 17.1% in April 2020, falling to 6.5% in October 2020 and then 4.2% by November 2021.[37] Thus, labor market data and other evidence suggests that Plaintiff's damages approach, which assumes Mr. Deegan will not find comparable employment for 15 years, is speculative.

---

[32] U.S. Bureau of Labor Statistics, Unemployed persons by age, sex, race, Hispanic or Latino ethnicity, marital status, and duration of unemployment, 2020, Table 31 and Unemployed persons by occupation, industry, and duration of unemployment, 2020, Table 32.

[33] See, for example, U.S. Bureau of Labor Statistics, Job Openings: Retail Trade retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/JTS4400JOL; U.S. Bureau of Labor Statistics, Hires: Retail Trade retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/JTS4400HIL.

[34] See, Gabriel T. Rubin, "Jobs Gap Has Grown to Two Unemployed Workers Per Three Openings Since Summer," *Wall Street Journal*, December 8, 2021.

[35] U.S. Bureau of Labor Statistics, Unemployment Rate in Florida [FLUR], seasonally adjusted, retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/FLUR, January 7, 2022.

[36] Percentages are seasonally adjusted. See, Local Area Unemployment Statistics (LAUS) at https://floridajobs.org/economic-data/local-area-unemployment-statistics-(laus)/laus-by-county.

[37] Percentages are not seasonally adjusted. U.S. Bureau of Labor Statistics, Unemployment Rate - Wholesale and Retail Trade, Private Wage and Salary Workers [LNU04032235], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/LNU04032235.

Charles River Associates

### 2. *Plaintiff's damages approach implies Mr. Deegan would have been paid far above the market rate until retirement*

24. As described above, Plaintiff's damages model is a comparison of two income streams: one is based on the value of Mr. Deegan's salary and benefits had his termination not occurred and the other is based on his current salary in an alternative job at Holiday Inn Express under the assumption that he would not be able to do any better through his expected retirement age.  This scenario is inherently speculative and without basis.

25. Plaintiff's damages model assumptions lead to differences in future earnings streams of approximately $69,144 on an annualized basis until 2035.[38]  Plaintiff's calculations are therefore based on assumptions that imply T.J. Maxx would have paid $69,144 more per year to Mr. Deegan than any other company would have been willing to pay him, for many years. This assumption contradicts standard models of the labor market.

26. First, the standard economic model of competitive labor markets holds that workers are paid the amount of value that they add to their employer, a concept that is called the workers' value of marginal product.[39] Each company in the market determines how much it is willing to pay a worker, and the highest amount a company should be willing to pay a worker is the amount that worker adds to the company's revenues.[40] Otherwise, the worker would not be profitable to employ. The standard economic model of labor demand also holds that a company will pay a worker at least enough to deter that worker from leaving and going to another company. That amount will be equal to the amount other companies are willing to pay the worker since if other companies were willing to pay more, the worker is likely to leave.  It is unreasonable to assume that T.J. Maxx would need to pay Mr. Deegan $69,144 above any other company, i.e., his market value, in order to keep him.

27. Second, Plaintiff's model's assumptions conflict with human capital theory, which is a standard labor economic model of the skills that workers bring to a company that generate value.[41]  The human capital model distinguishes between two types of job skills acquired by workers, general and specific skills. General skills can be thought of as "portable" skills that would be valuable at any job or in any company. There are many examples of general skills: active listening, speaking, reading comprehension, critical thinking, writing, monitoring, coordination, social perceptiveness, judgment and decision-making, complex problem-solving, active learning, and time management. These are skills that would be valued by almost any employer and in any employment setting. Because general skills are valued in all companies and industries, these skills make mobility across jobs easier.

---

[38] $85,000+$10,143-$26,000 = $69,144.

[39] See, for example, Borjas, George J., *Labor Economics.* Boston: McGraw-Hill/Irwin, 2008; Ehrenberg, Ronald and Robert Smith, *Modern Labor Economics*. New York: Routledge, 2017.

[40] This amount is referred to as the "value of marginal product", or the "marginal revenue product of labor." This is a concept that is taught in virtually all undergraduate and graduate level labor economics courses (see e.g. Borjas, *Labor Economics*; Ehrenberg and Smith, *Modern Labor Economics*).

[41] Becker, Gary S., Human Capital: A Theoretical and Empirical Analysis, with Special Reference to Education. University of Chicago Press, 1964.

28. Specific skills are skills that are specific to a particular company, industry, or occupation.  As an example, for an accountant, skills that are specific to the occupation may include knowledge of accounting rules and procedures. Skills that might be specific to a particular job might include knowing the state or local tax laws that apply to one jurisdiction but not to others. When a worker switches jobs, specific skills might not be valued at the new job.

29. While it may take a worker time to search for a job, and some time for another company to find the worker who is searching, economic theory predicts that in a competitive labor market, for a worker with mostly general skills, the worker's pay should return to the level it was at the previous company, or at least very close. For a worker with a lot of specific skills, his new pay would be expected to be lower as many of the skills he was formerly being compensated for are no longer valued in her new occupation. Research has found that workers who subsequently find jobs in the same industry or occupation as the one from which they were terminated tend to return to their pre-job-loss level of earnings.[42]

30. The evidence I have reviewed suggests that Mr. Deegan has developed general skills over a 20-plus-year career of growing levels of responsibility and he has emphasized these general skills in his resume and applications to potential employers.[43] For example, Mr. Deegan's resume in evidence spotlights his expertise in retail management and his skill set that includes merchandising, operations, customer service, human resource management, expense control and loss prevention, to name a few.[44]

31. In addition, labor markets tend to learn about workers' skills and value.[45] This body of research indicates that as Mr. Deegan worked for a new employer, that employer would learn he had valuable skills that would lead to pay raises and promotions, increasing his earnings to a level commensurate with the value he brought to the company.

32. For all these reasons, it is much more likely that Mr. Deegan's earnings would eventually return to their pre-termination level, in contrast to the assumptions embedded in Plaintiff's damages model.

### 3. Plaintiff's damages approach incorrectly assesses the value of lost benefits

33. Based on the available information I have reviewed, Plaintiff's damages approach incorporates a number of critical errors that result in unreliable estimates of the benefit loss Mr. Deegan may have sustained as a result of the alleged acts.

34. First, Plaintiff's model includes an annual "loss" of $1,881.12 associated with his 401(k) retirement benefit at T.J. Maxx.[46]  However, this is the amount that Mr. Deegan contributed to the 401(k)

---

[42] Neal, Derek, "Industry-Specific Human Capital: Evidence from Displaced Workers," *Journal of Labor Economics* 13(4), 1995.

[43] *Deegan Deposition*, Exhibit 24.

[44]  *Deegan Deposition*, Exhibit 24.

[45] Altonji, Joseph G. and Charles R. Pierret, "Employer Learning and Statistical Discrimination," Quarterly Journal of Economics 116(1), 2001: 313-350; Lange, Fabian, "The Speed of Employer Learning," Journal of Labor Economics, 25(1), 2007.

[46] *Deegan Deposition*, Exhibit 23, p. 233; TJ MAXX000234.

benefit plan, not T.J. Maxx's matching contribution.  The employer matching contribution is the appropriate amount to be considered in any loss calculation.  As such, this is an erroneous amount to include as a loss.

35. Next, Plaintiff's model includes an annual "loss" of $940.56 associated with the Roth retirement plan benefit.[47] However, this is the amount that Mr. Deegan contributed to the Roth plan, and I understand that T.J. Maxx does not provide a matching contribution.[48]  As such, this is an erroneous amount to include as a loss.

36. In addition, Plaintiff's model includes an annual "loss" of $6,801.74 associated with healthcare coverage.[49]  While I am unable to verify this amount, Mr. Deegan testified that this was the amount that he paid (rather than T.J. Maxx's contribution) and that because his wife also works for the holding company, neither the benefit nor the cost of the healthcare coverage changed for his family.[50]  As such, this is an erroneous amount to include as a loss.

37. While Mr. Deegan testified that he receives no benefits from his job at Holiday Inn Express, Plaintiff's damages model assumes without basis that he would never obtain a position comparable to his former T.J. Maxx job that offers similar benefits, or any benefits at all.

### D.  Mr. Deegan's Efforts to Seek a Comparable Job

38. I do not have a legal opinion on the standards for mitigation in employment matters, although other jobs meeting Mr. Deegan's qualifications and similar to his previous position at T.J. Maxx have been available.  Mr. Deegan is currently employed in a job that pays him approximately 27% of his former T.J. Maxx earnings.[51]  My analysis presented in this section shows that many jobs meeting Mr. Deegan's qualifications and comparable to his former T.J. Maxx position have been available in the marketplace and that Mr. Deegan's job search efforts do not meet objective benchmarks of job search set by the state of Florida.

#### 1.  Mr. Deegan's Job Search Efforts

39. I understand that Mr. Deegan was asked to identify all efforts and produce all documents or information related to his job search following his departure from T.J. Maxx.[52] Exhibit 2 summarizes the companies and/or positions to which I understand Mr. Deegan claims to have submitted resumes or applications up through January 7, 2022.[53]

40. As shown in Exhibit 2, Mr. Deegan has made approximately 45 potential job contacts[54] over the approximate 20-month period since stores began opening back up following the worst of the

---

[47] *Deegan Deposition*, Exhibit 23, p. 233; TJ MAXX000234.
[48] The TJX Companies, Inc., General Savings/Profit Sharing Plan, Summary Plan Description, Revised June 2018, p. 4.
[49] *Deegan Deposition*, Exhibit 23, pp. 233-234; TJ MAXX000234.
[50] *Deegan Deposition*, Exhibit 23, pp. 233-234.
[51] This includes the value of Mr. Deegan's benefits at T.J. Maxx.
[52] Plaintiff's Answers to Defendant's First Interrogatories, #4; *Deegan Deposition*, pp. 37-69, 76-82, and 236-238.
[53] I have been informed that Mr. Deegan agreed to provide updated job search documentation by January 7, 2022.
[54] This count may include multiple applications to the same job in some instances.

pandemic.[55]  On average, he made one job contact about *every other week*, or roughly two contacts per month.  Across the period, Mr. Deegan does not appear to have contacted five or more establishments in any given week, and typically far fewer.  Moreover, many of the positions to which he applied do not appear comparable to his former position and he further testified that in some instances he dropped off resumes without knowledge of whether a job opening was available.[56]  As I discuss below, Mr. Deegan's search efforts fall short of the required level of job search and employer contacts required by the state of Florida for those collecting unemployment benefits.

### *2.  Relevant Positions Are Available*

41.  An analysis of a sample of recent job postings in the state of Florida indicates that a significant number of jobs are available in the area that appear to meet Mr. Deegan's qualifications and are comparable to his former T.J. Maxx position (see, Exhibit 3).[57]  I conducted my job search analysis beginning in December 2021 shortly after I was retained in this matter, focusing on a geographic market within 1.5 hours' drive of Lake Wales, Florida.[58]  My search and analysis flagged relevant job postings using job board aggregators such as Indeed.com and Ziprecruiter.com, that have been available recently.[59]

42.  Exhibit 3 is not meant to be all-inclusive of available jobs, rather it illustrates the types of positions that have recently been available to which Mr. Deegan could have applied, although the evidence I have reviewed does not indicate he has pursued them.[60]  Specifically, in the November 2021 to early January 2022 timeframe, I identified some 30 suitable job openings available in the relevant geographic area to which Mr. Deegan could have applied.

### *3.  Job Search Criteria Developed by the State of Florida*

43.  Guidelines issued by the Florida DEO describe the necessary conditions that constitute adequate job search in the context of obtaining unemployment insurance.[61]  The DEO's guidelines and

---

[55] ("Retail closed and no positions available until May 2020 places started to open back up.").  See, Plaintiff's Answers to Defendant's First Interrogatories, #4; In addition, I understand the T.J. Maxx affiliate, HomeGoods, where Mr. Deegan's wife transferred to in Florida was open the week after Mother's Day in 2020. *Deegan Deposition*, pp. 53-54.

[56] See, for example, *Deegan Deposition*, pp. 46-50.

[57] I have included assistant manager positions at retail outlets in my search. These positions may be expected to offer a promotional path to a store manager or supervisor position, whereas Mr. Deegan testified that his current position does not. *Deegan Deposition*, pp. 79-80.

[58] Mr. Deegan testified that he has applied to places like Orlando and Lakeland, Florida and that he used to drive 1.5 hours to work at the T.J. Maxx in North Conway, New Hampshire. He testified that he was willing to drive up to 1.5 hours for a store manager position.  See, *Deegan Deposition*, pp. 65-67.

[59] In fact, Mr. Deegan did use Indeed.com to search for jobs in the past.

[60] I was unable to conduct historic searches of opportunities available back to January 2020 if they were no longer posted on the internet.

[61] I understand that Mr. Deegan received unemployment insurance benefits in New Hampshire following his separation from T.J. Maxx. *Deegan Deposition*, pp. 236-237.  In the state of New Hampshire, unemployment benefit claimants must be ready, willing, and able to accept and perform suitable work. In addition, the claimant

recommendations serve as a useful benchmark or standard regarding what constitutes reasonable effort in search of work, as the agency's guidelines were designed to expedite benefit claimants' attainment of suitable employment.[62]  The most important benchmark is that the DEO requires active job seekers to make a <u>minimum of five job contacts per week</u>.[63]  Evidence from the record (described above) indicates that Mr. Deegan made one job contact about every other week on average and did not apply to many positions comparable to his former position that were available in his geographic area.  In other words, on average, Mr. Deegan engaged in about one-tenth the amount of job search required by the DEO.  While Mr. Deegan is currently employed at a significantly lower paying job, his damages model assumes (without basis) that he will remain at this low paying job until his retirement, even though I understand Mr. Deegan has a duty to mitigate his damages by making reasonable efforts to obtain comparable or substantially similar employment to his former position.

44. My analysis based on these job search standards shows that Mr. Deegan's past documented job search efforts do not meet these objective criteria of an adequate search for a position that is comparable to his previous position at T.J. Maxx, thereby minimizing damages.


_____

Michaelyn Corbett, Ph.D.

January 10, 2022

---

must be engaged in *weekly* work searches, which can be achieved through a combination of <u>five</u> activities (e.g., registering with placement agencies, attending workshops, posting resumes on online recruiting sites) and/or employer contacts. See, Applying for New Hampshire Unemployment Benefits, New Hampshire Employment Security, at https://www.unemploymentbenefits.nh.gov and video at https://mm.nh.gov/media/nhes/worksearch-instruction-v2.m4v.

[62] See, Florida Department of Economic Opportunity, Work Search and Work Registration FAQs, updated 7/29/2021 at http://www.floridajobs.org/docs/default-source/reemployment-assistance-center/work-search/work-search-and-registration-faqs.pdf.

[63] In addition, unemployment benefit claimants must also be ready, willing, and able to accept and perform suitable work. Florida Department of Economic Opportunity, Work Search and Work Registration FAQs, updated 7/29/2021 at http://www.floridajobs.org/docs/default-source/reemployment-assistance-center/work-search/work-search-and-registration-faqs.pdf.



Exhibit 1

# Michaelyn Corbett, Ph.D.
Principal

One South Wacker Drive, Suite 3400
Chicago, IL 60606
Direct: 312.577.4175
mcorbett@crai.com

Ph.D., Economics
University of Illinois

M.A., Economics
University of Illinois

B.S., Finance
St. Louis University

Dr. Michaelyn Corbett serves as a consulting and testifying expert in complex litigation requiring the application of economic, financial, and statistical analysis to legal and regulatory issues. She frequently assists clients in addressing labor market issues such as allegations of wrongful termination; alleged discrimination with respect to reductions-in-force, hiring, and promotion; alleged misclassification of workers as independent contractors, and pay equity audits.

In addition to her labor and employment work, Dr. Corbett is experienced in addressing economic issues in antitrust and competition policy, class action certification, consumer fraud, and damages calculations in commercial disputes such as breach of contract and lost business profits. She has worked in a variety of industries including medical and pharmaceutical, food service, retail, insurance, communications, transportation, professional sports, and industrial and technology markets.

Dr. Corbett has taught Industrial Organization in the Economics Department at Loyola University, Chicago.  Prior to joining CRA, Dr. Corbett held senior positions with several economic consulting firms, including Ankura Consulting, Navigant Economics, and LECG.

## Practice Areas

- Labor market and employment actions
- Antitrust and competition policy
- Statistical modeling
- Class certification
- Consumer fraud and product liability
- Breach of contract and general commercial damages

## Select Industry Experience

- Healthcare (payers and providers)
- Food service
- Retail
- Technology and communications
- Industrial markets
- Insurance
- Sports

## Select Experience

- Provided expert consulting and testifying services addressing mitigation and damages issues in a variety of labor and employment disputes.
- Performed workforce assessments and addressed liability issues in allegedly discriminatory workforce reductions.
- Conducted damages analysis associated with alleged defamation by employer of terminated employees.
- Prepared literature review and economic assessment of the role of technology and other factors in addressing workforce challenges in the retail industry.
- Addressed key economic issues related to class certification in alleged violation of consumer fraud and deceptive business practices laws in various markets, including consumer products, technology products, and financial instruments.
- Assessed relevant economic factors pertaining to alleged worker misclassification (employee vs. independent contractor), in industries including ride-sharing and delivery.
- Calculated lost business profits in matters such as breach of contract, theft of trade secrets, and breach of non-compete agreements.
- Assisted in economic analysis to rebut claims in an antitrust suit alleging monopolization, refusal to deal, boycott of rivals, and violation of the essential facility doctrine in a defined mobile marketing market.
- Provided an economic assessment of an alleged "hub-and-spoke" conspiracy in industrial lighting manufacturing and distribution markets.
- Performed econometric analysis to calculate damages and assess pass-through in alleged price-fixing conspiracy in several industries including auto parts and optical disc drives.
- Performed econometric and statistical analysis to the estimated facility-level incremental costs of national healthcare provider accused of engaging in kickback scheme that undercharged commercial Medicaid payers.
- Assessed liability and damages issues associated with alleged exclusionary conduct in the railroad industry.
- Calculated damages and prepared rebuttal testimony in an international arbitration related to a breach of contract dispute between the largest wallboard producers in South Korea.
- Assessed economic impact on insurance payments as a result of a medical device manufacturer's alleged breach of anti-kickback statutes.
- Analyzed antitrust counterclaims in a Walker Process intellectual property dispute in the software industry.
- Analyzed antitrust counterclaims of alleged exclusionary conduct (physician practice acquisitions in conjunction with exclusive arrangements with hospitals and physician non-competes) against an anesthesiology group in Florida. Conducted benchmarking analysis to examine the magnitude of alleged supra-competitive pricing and resulting damages.
- Analyzed market and competitive effects of a merger of medical professional liability insurance companies in New Jersey.
- Contributed to whitepaper on pharmacy benefit manager-owned (PBM) mail order pharmacies.

- Performed market definition analysis, assessed barriers to entry, market power and concentration, and competitive effects in antitrust challenge to a merger between two health plans in New York.
- Performed economic analysis of alleged wrongful market allocation and foreclosure of competition in radiology service markets in New York.
- Analyzed alleged monopolization and foreclosure claims in eye care and eye wear industry.
- Provided economic analysis associated with monopolization and attempted monopolistic leveraging in alleged markets for professional golf scores.
- Conducted economic analyses into alleged monopolization and conspiracy to boycott claims in senior professional tournament golf in the U.S.
- Performed liability and damages analysis related to allegations of price-fixing, market allocation, group boycott, and wrongful tying arrangements in physician service markets. Analysis included economic assessment of joint-contracting practices and the messenger model.
- Assisted with economic analysis of competition and price discrimination in the food service and distribution industries (Robinson-Patman claims).
- Performed pre-merger market analysis consultation with hospital clients to assess risk of antitrust challenge.
- Calculated damages in pharmaceutical patent infringement cases.
- Estimated "usual and customary" provider charges in disputes between healthcare providers and commercial insurers where no contractual relationship existed.
- Conducted economic study of "but-for" contracting rates in alleged breach of contract by healthcare payer, including analysis of trends in billed charges and benchmark contractual rates in Southeastern U.S.
- Performed economic analyses related to methodology for calculating "unmet need" in a "Certificate of Need" challenge of a home health entity in Montana.
- Performed damages analysis related to alleged breach of contract between healthcare provider and medical bill collector.
- Offered economic critique of hospital's allegation of damages resulting from cigarette manufacturers' tortious conduct.
- Estimation of economic damages due to alleged wrongful termination of supply contract between pharmaceutical companies.
- Analyzed opposing expert's damages approach for defendant in a False Claims Act lawsuit.
- Economic analysis of real estate developer's action in the context of the "Unfairness Doctrine" in Florida.
- Analyzed the economic feasibility of an oil refiner to supply a product other than the alleged defective product in a product liability matter in New Jersey.
- Analyzed alleged lost profits and unjust enrichment of wallboard manufacturer relating to allegations of patent infringement and misappropriated trade secrets.

## Expert Testimony

- *Joan Landry v. Abbott Laboratories*, In the U.S. District Court for the Northern District of Illinois, Eastern Division, Case No.: 1:17-cv-0849, May 15, 2019 (deposition testimony)

- RiverStone Health's Challenge to Able Valley's Home Health Services "Certificate of Need" Application, Billings, MT, 2012 (hearing testimony)

- Our Lady of Bellefonte Hospital, Ashland, KY: Analysis of "Certificate of Need" Application and Challenge, Kentucky Office of Health Policy, Frankfort, KY, 2006 (hearing testimony)

- Maryland Insurance Administration, Baltimore, MD
  Analysis of charitable asset distribution related to CareFirst Blue Cross Blue Shield for-profit conversion, 2003 (hearing testimony)

## Professional History

- Charles River Associates, Principal (April 2020 – present)

- Ankura Consulting Group, Managing Director (August 2018 – April 2020)
    - Corporate 401(k) Investment Committee Member (2018 – April 2020)
    - Lead economics practice recruiter in Chicago

- Navigant Economics, Director (July 2010 – August 2018)
    - Corporate 401(k) Investment Committee Member (2014 – 2018)
    - Corporate Innovation Development Council (IDC) Member – assisted Navigant's Executive Committee in identifying processes to foster innovation at the firm

- Adjunct Instructor, Loyola University of Chicago, Economics Department (2013-2014)

- LECG, LLC, Managing Economist, 2000 – July 2010
    - Lead junior staff recruiter and professional staff coordinator

## Publications, Presentations, and Workshops

- Panelist, CRA-sponsored webinar panel, "Are there barriers in the pipeline of qualified diverse board candidates?" June 2021.

- "Estimating Wrongful Termination Damages Amid COVID-19," Law360, June 10, 2020.

- Contributor to Prepared Comments for the Antitrust Law Section of the ABA in connection with the FTC workshop on "Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues," Final Comments - April 2020.

- Panelist, American Bar Association Roundtable: "Working Effectively with Experts in Testimony," April 23, 2020.

- "U.S. Women's Soccer Bias Suit Raises Complex Pay Questions," Law360, December 5, 2019.

- "Criticism—Fear Not!" Practice Points, American Bar Association, Section of Litigation, The Woman Advocate Committee, 2014.

- "Illinois' Health Benefit Exchange Federal Partnership and Beyond," *Health Lawyers Weekly*, April 12, 2013 Vol. XI, Issue 14, publication of the American Health Lawyers Association (with Catherine Sreckovich and Christine Vogel).

- Economic Analyses of the Competitive Impacts from the Proposed Acquisition of Princeton Insurance Company by Medical Protective Corporation, November 23, 2011 (with James Langenfeld and Robert Kneuper).

- "A Primer on Trademarks and Trademark Valuation," (with Mohan Rao and David Teece) in Economic Damages in Intellectual Property, Ed., Daniel Slottje, (John Wiley & Sons), 2006.

- "Bucking the For-Profit Trend – The Case of CareFirst of Maryland," Working Paper, 2004.

- "Prescription Drugs and Mass Media Advertising" (with James Langenfeld), Working Paper, 2003.

- "Potential Benefits from Direct-to-Consumer Advertising of Prescription Drugs: The Cases of Antidepressants and Statins," (with Jack Calfee and James Langenfeld), 2003.

- "Challenges to Managed Care Practices in Healthcare and their Potential Effects," (with James Langenfeld), LECG Perspective, Volume 1(4), October 2000.

- "Competition in U.S. Healthcare and its Future" (with James Langenfeld). Global Competition Review, pp. 29-30, October 2000.

- Experimental Economics Workshop led by (future) Nobel Laureate, Vernon Smith, invited workshop participant, University of Arizona, Tucson, AZ, 1999.

**Exhibit 2**

**Record of Mr. Deegan's Job Contacts Following His Departure from T.J. Maxx**

| Count | Company | Position | Location | Approximate Application Date** | Job Contact Source |
|---|---|---|---|---|---|
| 1 | Home Depot | Unknown | North Conway, NH | Jan-20 | Applied in-person |
| 2 | Lowe's [1] | Unknown | North Conway, NH | 2/7/2020 | Indeed.com |
| 3 | American Marketing [1] | Unknown | Venice, Florida | 2/13/2020 | Indeed.com |
| 4 | Bealls | Store Manager | Lake Wales, Florida | 3/28/2020 | Unknown |
| 5 | Bealls | Outlet Store Manager | Lake Wales, Florida | 5/28/2020 | Indeed.com |
| 6 | Spencer's Gift | Store Manager | Unknown | Jun-20 | Unknown |
| 7 | Dollar Store | Store Manager | Unknown | Jun-20 | Unknown |
| 8 | Game Stop | Store Manager | Unknown | Jun-20 | Unknown |
| 9 | Unknown | Thrift Store Manager | Winter Haven, FL | Jul-20 | Unknown |
| 10 | Goodwill | Store Manager | Winter Haven, FL | Jul-20 | Unknown |
| 11 | Ollie's | Store Manager | Avon Park, FL | 8/28/2020 | Indeed.com |
| 12 | One Main Financial | Unknown | Unknown | Sep-20 | Unknown |
| 13 | Proflex | Online Customer Service Rep | Unknown | 10/9/2020 | Indeed.com |
| 14 | Lowe's | Unknown | Lake Wales, FL | 10/26/2020 | Indeed.com |
| 15 | Advanced Auto Parts | Unknown | Unknown | 10/29/2020 | Indeed.com |
| 16 | Trinity Services Group [1] | Unknown | Unknown | 11/17/2020 | Indeed.com |
| 17 | Unknown | Thrift Store Manager | Lake Wales, FL | 11/20/2020 | Unknown |
| 18 | GC Services | Call Center Rep | Unknown | 12/3/2020 | Indeed.com |
| 19 | NXT thing RPO | Unknown | Unknown | 12/10/2020 | Indeed.com |
| 20 | Cititrends ASM | Unknown | Lakeland, FL | 12/16/2020 | Indeed.com |
| 21 | Kelly Services | Human Resources | Unknown | 1/18/2021 | Indeed.com |
| 22 | CMX | Manager | Winter Haven, FL | 2/1/2021 | Unknown |
| 23 | Sonny's BBQ | General Manager | Haines City, FL | 3/1/2021 | Unknown |
| 24 | Westgate | Customer Service Rep | Unknown | 4/10/2021 | Unknown |
| 25 | Westgate Resorts [1] | Manager | Unknown | 5/23/2021 | Indeed.com |
| 26 | Kohl's Department Store | Manager | Lake Wales, FL | May-21 | Unknown |
| 27 | Warner College Book Store | Store Manager | Unknown | May-21 | Unknown |
| 28 | Holiday Inn Club Vacations | In-House Marketing Manager | Davenport, FL | 6/5/2021 | Indeed.com |

Charles River Associates

**Exhibit 2**
**Record of Mr. Deegan's Job Contacts Following His Departure from T.J. Maxx**

| Count | Company | Position | Location | Approximate Application Date** | Job Contact Source |
|---|---|---|---|---|---|
| 29 | Payroll Solutions Group Inc. | Retail Store Manager | Lakeland, FL | 6/6/2021 | Indeed.com |
| 30 | Mattress Firm | FT Sales Associate | Lake Wales, FL | 6/7/2021 | Indeed.com |
| 31 | CMX | Assistant Manager | Unknown | 6/15/2021 | Indeed.com |
| 32 | Tractor Supply Company | Unknown | Sebring, FL | 6/18/2021 | Indeed.com |
| 33 | Aflac Insurance [1] | Sales Rep/Insurance agent | Orlando, FL | 6/24/2021 | Indeed.com |
| 34 | Buddy's Home Furnishing's | Customer Service Associate | Haines City, FL | 6/30/2021 | Indeed.com |
| 35 | Holiday Inn Express [1]* | Front desk clerk | Lake Wales, FL | 7/1/2021 | Indeed.com |
| 36 | Top Villas-Luxury Vacation Homes | Reservation Agent | Davenport, FL | 7/1/2021 | Indeed.com |
| 37 | Sonny's BBQ | General Manager | Haines City, FL | 7/3/2021 | Indeed.com |
| 38 | Magical Vacation Homes | Guest Experience Manager | Davenport, FL | 7/31/2021 | Indeed.com |
| 39 | Buff City Soap | Store Manager | Davenport, FL | 8/6/2021 | Indeed.com |
| 40 | Big Lots | Store Manager | Winter Haven, FL | 9/7/2021 | Indeed.com |
| 41 | Orange Blossom Auto Glass | Customer Service Rep | Lake Wales, FL | 9/13/2021 | Indeed.com |
| 42 | Alan Jay Automotive Network | Sales Consultant | Sebring, FL | 9/16/2021 | Indeed.com |
| 43 | Buff City Soap [1] | Soap Maker | Davenport, FL | 9/17/2021 | Indeed.com |
| 44 | CMX Cinemas | Assistant Manager | Winter Haven, FL | 9/19/2021 | Indeed.com |
| 45 | Lowe's Home Improvement | ASM Operations | Haines City, FL | 9/24/2021 | Indeed.com |
| 46 | Town Star | Store Manager | Frostproof, FL | 10/5/2021 | Indeed.com |
| 47 | Lighthouse Ministries | Thrift Store Manager | Winter Haven, FL | 10/7/2021 | Indeed.com |
| 48 | CMX Cinemas | Assistant Manager | Winter Haven, FL | 10/25/2021 | Indeed.com |
| 49 | Legoland | Retail Manager; Ticket Sales Manager | Winter Haven, FL | Oct-21 | Unknown |

**Notes:** * I understand Mr. Deegan was hired and started work at Holiday Inn Express on or around 7/9/2021.
** Mr. Deegan claims to not have been actively job searching for two weeks during March/April 2020 and two weeks in September 2020 due to personal reasons.  In some cases, dates differ between sources as to when Mr. Deegan applied to a position. When an application date is available directly from the application confirmation record, I use that date. In addition, in some cases, this exhibit lists the same company/position more than once (i.e., with multiple dates). In some cases it is unclear whether Mr. Deegan applied multiple times to the same job over the period or whether his application records are incorrect.

[1] Indicates that inconsistent application dates were listed across two or more sources.

**Sources:** Plaintiff's Answers to Defendant's First Interrogatories, # 4;  *Deegan Deposition*;  Plaintiff's supplemental job search records.

**Exhibit 3**
**Recent Sample of Potential Suitable Positions Available in Florida**
December 2021-January 2022[1]

| Count | Available Job | Company | Location | Job Post Date[2] | Job Posting Board |
|-------|--------------|---------|----------|------------------|-------------------|
| 1 | Full-Time Store Manager Trainee | Aldi | Lake Wales, FL | 12/1/2021 | Indeed.com |
| 2 | Full-Time Assistant Store Manager | Aldi | Auburndale, FL | 11/13/2021 | Indeed.com |
| 3 | Assistant Store Manager | PetSmart | Lake Wales, FL | At least 11/1/2021 | Indeed.com |
| 4 | Store Manager | Hibbitt Retail, Inc. | Lake Wales, FL, Lakeland, FL, Bartow, FL, and Winter Haven, FL | At least 11/05/2021 | Indeed.com |
| 5 | Assistant Manager | Rural King Supply | Lake Wales, FL | At least 11/1/2021 | Indeed.com |
| 6 | Operations Assistant Manager | Dollar Tree | Lake Wales, FL | 12/1/2021 | Indeed.com |
| 7 | Retail Store Manager | CVS Health Retail | Lakeland, FL | At least 11/3/2021 | Indeed.com |
| 8 | Co Manager | RaceTrac | Lake Wales, FL | At least 11/2/2021 | Indeed.com |
| 9 | General Manager | RaceTrac | Lake Wales, FL | At least 11/2/2021 | Indeed.com |
| 10 | BBW Asst Mgr | Bath & Body Works | Lake Wales, FL | At least 11/2/2021 | Indeed.com |
| 11 | MANAGER TRAINEE | AutoZone | Lake Wales, FL | 11/7/2021 | Indeed.com |
| 12 | Store Manager | Ross Dress for Less | Orlando, FL | 12/1/2021 | Indeed.com |
| 13 | Store Manager | Safelite | Orlando, FL | 11/12/2021 | Indeed.com |
| 14 | Store Manager | Circle K | Orlando, FL | 12/1/2021 | Indeed.com |
| 15 | Retail Co-Manager | Hobby Lobby | Orlando, FL | 11/16/2021 | Indeed.com |
| 16 | Salaried Retail Manager | IKEA | Orlando, FL | 11/30/2021 | Indeed.com |
| 17 | Head Coach (Store Manager) | NIKE | Orlando, FL | 11/4/2021 | Indeed.com |
| 18 | Grocery Manager/Store Manager | Level-Resources LLC | Orlando, FL | 12/1/2021 | Indeed.com |
| 19 | Store Manager | Big Lots | Orlando, FL | 11/28/2021 | Indeed.com |
| 20 | Store Manager | Trulieve | Bartow, FL | At least 11/2/2021 | Indeed.com |
| 21 | Retail Manager | WalMart | Haines City, FL | 11/5/2021 | ZipRecruiter.com |
| 22 | Store Manager | WalMart | Winter Haven, FL | 11/30/2021 | Indeed.com |
| 23 | Store Manager | The Chop Shop | Lakeland, FL | 11/29/2021 | Indeed.com |
| 24 | Store Manager | Harbor Freight Tools USA | Auburndale, FL | 11/20/2021 | Indeed.com |
| 25 | Retail Sales Manager | Harbor Freight Tools USA | Lake Wales, FL | 12/20/2021 | Indeed.com |
| 26 | Store Manager | Five Below | South Lakeland, FL | 12/30/2021 | Indeed.com |

Charles River Associates

**Exhibit 3**
**Recent Sample of Potential Suitable Positions Available in Florida**
**December 2021-January 2022[1]**

| Count | Available Job | Company | Location | Job Post Date[2] | Job Posting Board |
|---|---|---|---|---|---|
| 27 | Store Manager | Andy's Frozen Custard | Lakeland, FL | 12/6/2021 | Indeed.com |
| 28 | Inventory/Freight Control Manager | At Home/The Home Décor Superstore | Clermont, FL | 11/17/2021 | Indeed.com |
| 29 | Manager in Training | Circle-K | Auberndale, FL | At least 12/1/2021 | Indeed.com |
| 30 | Retail Store Management | Burlington Stores (new store) | Lakeland, FL | 12/7/2021 | Indeed.com |

**Notes:**

[1] My job posting research occurred in December 2021 and January 2022.

[2] In some cases, a job posting contained an upper threshold for "days since a job posting was first submitted," in which case "at least" was attached to the end of date in the "Job Post Date" column. For example, if a search for jobs was performed on December 31, 2021 and a posting was found indicating the job was posted "30+ days ago," then I have assigned the value in the "Job Posting Date" as "at least 12/1/2021."

**Sources:**
I conducted web searches on job search engines including Indeed.com and Ziprecruiter.com using the following search terms: Store Manager, Retail Store Manager (search results were filtered for full-time jobs within 1.5 hours drive from Lake Wales, FL).

Charles River Associates